Good afternoon. Illinois Appellate Court First District Court is now in session for Sixth Division. The Honorable Justice Aurelia Puchinski presiding, case number 23-2190, Pieper v. Keishon Sharp. Good afternoon, everyone. I'd like first to introduce my colleagues with me today, our Justice Michael Hyman and Justice Celia Gamrath. Second, I'd like to point out that it's been our policy to give the lawyers a sort of 5-10 minute question-free zone. Try to hit your most important points, remembering that we've read the briefs, we've read the cases, we're familiar with the case. So go to your high points first and your secondary and third points after that. Start with your best argument. And again, I'll just remind you that we've read everything that you've sent us on all the cases. So we're very familiar with this case. So with that in mind, I will ask the appellant to start. Ms. Ramos, we can't hear you. Unmute yourself. My apologies. I thought I hit them both when I did the video. It happens to all of us. May it please the court. My name is Karen Ramos and I represent the appellant, Keyshawn Sharp. The appellant argues that the trial court erred in dismissing his post-conviction petition. A quick summary of these claims and our alleged errors. We don't need the summary. We've read everything. Why don't you give us... I guess I say summary, but I mean just my brief highlight points. Well, what is your most... If there is one point that you say this is... I mean, you make several points and I'm sure you think they're all good and maybe they are, but they're not all equal. So what is the best point? Which one do you think is the one that's going to hit this out of the park? I think my most important point in everything concerning this case is I believe that the trial court judge made some errors when reviewing the facts, when reviewing the trial transcripts, and when considering what the post-conviction witnesses were testifying to and how that impacted their credibility. So which one of those... You say that in your brief, but what is material about any of that? You have a very high standard to try to overcome. I do have a very high standard. A third stage post-conviction is very difficult. It really is, especially because, especially on the appellate court's end, I do acknowledge that you're reading a transcript that is two-dimensional. You are not seeing the witness on the witness stand, you're not seeing their body language, you're not seeing their tone of voice, and I realize that puts the appellant, especially in a difficult place when we're arguing that the trial court made a mistake in these areas. However, I think it is relevant that when the trial court was considering credibility issues, some of her mistakes of fact are involved in that. For instance, when we consider, let's say, Michael Brock. Michael Brock testified consistently with his affidavit in regards to the facts of the crime that he observed, his direct observation of the crime, where he was, who he was with, where he went. A lot of the credibility determinations went to whether or not he considered himself an ally or an enemy of Keishon Sharp at any time or place, and that was very subjective as regarding the objective, who, what, where, when, and why, that he did recall. It wasn't his testimony different than was in his affidavit with regard to that issue of his relationship to the defendant? I do not believe it was different. How do you say that? I thought he said that they were on bad blood. There was, at one time they were in bad blood, and that sometimes he said that there were not enemies, but he wasn't going to go out of his way to do anything for him. I'm taking his affidavit versus what he testified. There's a difference there, and she can... I think it's a different, I think it's a subjective difference. I think it's just what he was feeling on that day, and I don't know that at any time he said that he was friends with Keishon Sharp or that he ever went out of his way for Keishon Sharp. And I also think it's relevant that when asked on cross-examination, you know, Mr. Brock, do you know who did this crime? Uvaka Brock eventually said, yeah, it was a man named Ron. Now, prior to the second trial, defense counsel did try to bring forward additional witnesses who said that they were willing to testify that the man who committed this crime was named Ronald Jackson. There's no way Uvaka, or I'm sorry, Michael Brock, there's two Brock's, Michael went out of his way to find out who this person was that was in a motion before the second trial. Well, we don't know that, but we also don't know, he didn't say the name in his affidavit. He did not say it in the affidavit, but he did say it. If he knew that, that's a really, when you say that's a key, you're saying that's really important that he had this name. And if he had the name, then why was it in an affidavit? That is, you know, if somebody else did it, and it's a claim of innocence, you would think that the name would be there if he knew the name all along. I have two answers for that, relevant to each other. One, Michael Brock is not an attorney. Michael Brock put forth what information he thought was relevant. What he thought was relevant is that he saw what happened, and it was not Keyshawn Sharp. Well, if it wasn't Keyshawn Sharp, he didn't, then he knew it was somebody else, yet he didn't say who he knew it might be. That is true, but- You don't have to be an attorney to do that. But is it the witness's job to say who is the actual shooter? Yes, when he's doing it, what was the purpose of the affidavit? The purpose of the affidavit is to say that you have the wrong man. It doesn't necessarily have to mean that I know who the right man is. Why not? For various reasons. One, it's hard enough, I'll be honest, as a defense attorney to get witnesses to be willing to come forward, say what they actually saw, especially in a neighborhood such as Harvey, Illinois. Okay? It's one thing to say, I didn't see this person do it. It's another to say, I saw who did it and put a target on your back. Now, yes, Michael Brock did not testify that he was scared during this evidentiary hearing, but it is something that I think should be considered when we consider any situation when we're dealing with an attempted murder such as this case in a high crime neighborhood. And he described why he made the decision not to come forward earlier. And he purposely said that he chose not to do it. It wasn't, oh, I talked to the police or I was scared of the police. He just said, I didn't want to get involved. And that is in 20 years experience as a defense attorney, you hear a lot from neighborhoods such as Harvey. I don't want to get involved. I want to stay out of it. It wasn't until Michael Brock, and this is his testimony. It wasn't until Michael Brock went through a situation similar where he himself was convicted that he said, you know what? I should come forward with what I know. But the standard is manifest error. And as we've discussed, it's very differential. And part of that is that a judge observes the demeanor, the credibility and so forth. And here, the court found that there was impeachment by these witnesses, memory gaps, bias, and their demeanor, which we, as you would note, we can't see. So we have to take all that. And I, you know, where is it clearly evident, which is what you have to show that something else is going on here. Okay. But I think where I've been focusing on this case is that the impeachment did not go to actual facts of the crime that the witnesses testified that they witnessed. The impeachment went to, well, do you like this guy or not? The impeachment went to, well, did you tell anybody about this or not? And he didn't tell anyone in law enforcement, as far as Michael Brock. For Rebecca Brock, the impeachment went to, well, who typed this affidavit? Is there more than one affidavit? And Rebecca testified there was an affidavit that he had that was not presented. The affidavit that's presented in this post conviction was not signed until after he was incarcerated. He didn't hide anything. Rodney Bowles was not impeached so much as he had memory issues. Though I do acknowledge that Curtis Anderson was impeached. And I think I highlighted it. There was a long time between 2011 and 2024 when we had this case. And Mr. Anderson testified that he had been drinking that day. He probably didn't remember. But I think my focus for the actual innocence claim, Michael Brock and Rebecca Brock, those impeachment situations were not what did they see? Who did they see? Where did they go? And I think that's the most relevant part of all of this. But doesn't the trier effect get the opportunity to make judgment calls about the witnesses' credibility based on all those things that you just said? Well, you think that they're irrelevant and you say they don't go to the alleged fact that was seen. There's a lot made up in judging somebody's credibility. And that's why this reviewing court gives so much deference to the trial judge in this situation. Which I understand and I appreciate. Okay, especially having sitting where I do at the defense table. And yes, I don't argue with the fact that globally you have to consider everything that the trial court saw and heard and the mood in the room. But I think sometimes there may be too much focus on the fact that a witness has a criminal past or was from the same neighborhood or was not from the same neighborhood. And it's all relevant. But I think my main points are in this case, you take both the credibility determination and the fact that there are some actual factual errors in what the judge considered. And that may have impacted her credibility determinations. What about the fact that would another jury credit the Brock's? I know they're not related, but the two Brock's over the victim and his father who identified Sharp and they saw him at close range, not from far away. And their testimony was consistent. Why would any jury consider the Brock's considering the factual background of what they came forward with over the victim and the father? The victim identified Keyshawn Sharp, both in a photo array at the hospital and in a live lineup. We acknowledge this. His father, however, within the first 24 hours did not identify Keyshawn Sharp in the photo array. And it was not until they were in front of the live lineup that Joseph Coleman, the father, identified Keyshawn Sharp. Before a trier fact, there is now and I realized this was not evidence necessarily presented in this post-conviction, but speaking towards a new jury trial about eyewitness identifications where there are guns involved, where there is. But again, that's not before us because there wasn't. No, it's not before you, but if you're considering what was the new jury going to consider, this are things that should be considered. But what case says that we should consider that? I mean, it wasn't brought up to that. It wasn't brought up below. Why should we consider that? I mean, if what you say is true, it might be true, but it could have been brought up below, and then we would have had that judge looking at that and considering that. But that wasn't done. Well, I guess my thought process was different, I guess, than the question that you asked. I was considering what could be brought before a new jury, and you're considering what is here and being brought before a new jury. So my apologies to that. Well, I think a little of both. But again, if that is something that's relevant for a new trial, it should have been relevant below because that's what you wanted was a new trial. That is true. That is true. But a lot of the eyewitness identification stuff was coming out as this post-conviction was a very long time through. So apologies if any of that's confusing for you. No, they're not confusing for me. But again, especially considering Joseph Coleman, he did not identify Keyshawn Sharp in the photo array because he said he wanted to see his face. His face was in the photo array. We know that, and we know he was convicted after that. Yes, he was. But my point is, when you have someone who doesn't necessarily pick someone out the first time and then pick out the second time after they've had time to perhaps, and this is not in the record, obviously, speak to their son about what they saw and didn't see and what have you, sit down and think about it for a long time. Did I really see Keyshawn Sharp who they both said they knew in the neighborhood? Again, we can't consider any of that. That's not in the record. But it's something for a new jury to consider. It's it. Some of it's in the record. And another point, though, is maybe the father was just being extra careful and didn't want him to speak when he saw the photo array. He said, I want to see this person live, so I am absolutely sure. That is definitely a possibility as well. It goes both ways. But having read this record more than once, I wonder how much Joseph Coleman actually saw, considering he ran and hid behind a bush for quite a while until the police came. He didn't run to his son. He ran behind a bush and hid. Yeah, but what we're looking at are the witnesses that are the new witnesses, the new the affidavit that that's what we're centering on. Again, we got to look at manifest there and it's not Joseph that we're looking at. You have two state witnesses who testified under oath that it's Keith that Keyshawn Sharp was the shooter. You now have two witnesses who testified under oath that Keyshawn Sharp was not the shooter. And I'm going to acknowledge that a lot of juries are going to be sympathetic to a victim and their to come forward and have no reason to lie for Keyshawn Sharp. Another slight point to be acknowledged. Are they really you're saying that they were disinterested parties? Is that what you're trying to tell us? By all testimony, they're not friends. They're both convicted felons who met Sharp in prison. Not true. Well, yes, Michael knew him beforehand. Yes. Yes, but they reconnected in prison. Michael Brock, I don't believe spoke to Keyshawn Sharp in prison. They were both located in the same facility, but they did not speak and they were not in the same gallery. I believe is the actual testimony. But Rebecca Brock did meet Keyshawn Sharp, but he also testified that they were acquaintances. They were not friends. They just happened to start speaking because they were from the same neighborhood and the case came up as happens out in the yard at the facilities. But there was no familial influence. There was no friendly influence. There's no indication anywhere that they're in the same kind of gang or any such things. They didn't get anything out of this testimony. I would put them as disinterested. Any other questions? No. Ms. Reynolds, are you ready to just wrap up? I'll just, you know what, you, I can tell that all of your honors have definitely, definitely read through everything and understand all of my points. So I'm just going to wrap up for now and accept any further questions later. Thank you. All right, Mr. Levitsky. Good afternoon, Assistant State's Attorney Brian Levitsky on behalf of the, I believe the people of the state of Illinois. May it please the court, counsel. My most important point to stress to this court is a standard overview, which we've been talking about for a moment. And it's why we can all have different opinions about what weight the individual impeachment should have been assigned regarding the actual innocence witnesses were presented. But ultimately the one person who was empowered to make those decisions was the post-conviction judge, Judge D'Souza. She did exactly what she was supposed to do in this case, which was consider the new evidence, weighed against the old, and predict what a jury would likely do if this case went to retrial. And looking at the old evidence to begin, we do have not just two state witnesses. We have the testimony of the victim himself. And this isn't someone who sees the offense from a distance under poor lighting conditions. We're talking about a victim who sees defendant walk up to him. There's some discussion about trying to get his attention by talking about the dog, comes, gives him like a bear hug or something. They're right in each other's... I have a question. It wasn't clear from the record. I know there's a map in the record, but each of the Bracks, how many feet were they away from the driveway? I don't believe there is a testimony about the exact distance. They admitted the maps that they indicated at the hearing. Those were... They said there were no trees and that would block their view. But I'm still... I wasn't clear whether that's within 10 feet, 100 feet, 100 yards. I don't know. There's nothing there. Yeah. I don't recall that the maps were marked in any such way. They're in the record, I believe. No, they're in the record. Respondents one and two. Mm-hmm. And... They may have had a very good view. It's entirely possible. And if we were at the second stage, I think it's exactly the sort of evidence that would warrant a hearing. Because if believed by a jury, taken as true, then it could potentially warrant the extraordinary remedy of vacating the conviction and giving the defendant a new trial. But we're at the third stage evidentiary hearing, where defendant's burden below was to establish his claim by a preponderance of the evidence. And his burden before this court isn't to simply argue that another judge could have decided differently, but that Judge D'Souza specifically manifestly erred in finding that the witnesses he presented were not credible. What's your response to the counsel's discussion of the factual errors and misstatements that the court made in her ruling? So, I think there's at least one that I have to concede. When Judge D'Souza said that Maurice Brown's affidavit was notarized one year after it was written, that seems to be... That's not true, according to the affidavit itself. Right. So, it's a little bit difficult to see because it seems to be cut off, at least in the record. So, that's an indication of something that I think we would have to concede. If the basis for finding Maurice Brown, for example, uncredible was just that fact, then that's clearly erroneous, I think. But finding that, for example, she described Michael Nubeka as being friendly with the defendant, I think that's a reasonable interpretation of the fact that they were, you know, enough acquainted that they were willing to come forward and offer these affidavits and testimony on his support. In terms of Michael Brock's testimony, there was a back and forth about did he really contradict himself about saying that he came forward or the testimony about whether he told other people about it, for example. I think those are probably things you could argue and maybe a different judge would have, you know, weighed it differently. But again, I don't think that raises the level of manifest error. And even if it did, Judge D'Souza gave us an indication about how these witnesses testified in a way that we don't get just from the record itself. She said that it was a credible testimony. The claims were sheer absurdity. She commented on the demeanor and body languages of the witnesses. And I understand it's difficult as a reviewing court to know how much weight to assign to that. But for example, if you read the transcript where Michael Brock is testifying after his testimony, the judge asked him to spit out some gum that he's chewing, which does lend some credits to the idea that maybe he wasn't taking the hearing particularly seriously. We had also argued in our closing argument that the witnesses didn't appear credible. So this isn't a case where the judge is simply making a blanket statement. There is some evidence in the record that actually shows that these witnesses did not testify with a credible demeanor. And that relates directly to what would a jury likely do if this went to a new trial? And it also relates to the defendant's evidentiary burden, because he does have to by a preponderance of the evidence. That's exactly what Coleman says. It wasn't changed in any subsequent case law. And it matters because the whole point of the third stage evidentiary hearing is to determine whether or not a defendant is entitled to that extraordinary remedy of having his conviction vacated, which is a necessary first step towards reaching a second trial. Counsel talked about Joseph Coleman, the victim's father, and the fact that he didn't immediately identify defendant as a shooter. I think the record itself from trial indicates that he had a visceral reaction to just seeing defendant in court. And I don't think the fact that he said he wanted to see defendant's face really detracts from his credibility. I think it shows that he was taking the task of identifying the man who shot his son in front of his home very seriously. And it actually, at least arguably, adds to his credibility. But certainly, it's the sort of thing that would not inert a defendant's burden here, which is to show that the judge's findings were manifestly erroneous. Defendant touched on some other possible evidence that could be admitted. People v. Jones is a case that I think we typically cite for the proposition that you cannot overturn a lower court's post-conviction decision based on allegations or evidence that weren't before it. If there is other evidence that defendant can point to or other arguments regarding eyewitness identification, testimony, whatever, the place to do so would be in a successive post-conviction petition, but not in a new trial, which defendant should not be entitled to based on evidence and arguments that he never presented in order to get relief in the first place. What would you say is your best argument as to why we should affirm? Again, it's the standard of review. Another judge looking at the same evidence could have come up with different credibility determinations, but the issue before this court is solely whether Judge D'Souza was clearly erroneous in denying defendant relief following third-stage evidentiary hearing. If there are no further questions, then for those reasons and those stated in her brief, the people would respectfully ask the Senate or the court to affirm that third-stage denial of the defendant's post-conviction petition. Thank you. Any other questions? No? Hearing none, Ms. Reynos, rebuttal? Thank you, Your Honor. I think the most salient point I want to bring up on rebuttal is that Judge D'Souza is the judge that has heard this case. She is the judge that heard it throughout the entire post-conviction process and the evidentiary hearing. And I realize that that means that we have to take her determinations to an important point. However, that doesn't mean that she could not have made a mistake, especially when she was considering all of the evidence, old and new, that includes the trial evidence, that includes the evidence presented at the evidentiary hearing, and how do they intersect, and that there is a probability that a jury, considering all of this evidence, might vote to acquit. And I think it's that credibility, that probability, I should say, that is most important in this case. Thank you. Thank you. All right. Any questions? Judge Hyman, Justice Gamreth? No? Sorry. Well, thank you both for your excellent oral arguments as well as your excellent briefs. We really appreciate the time and energy it takes to do these things for our court. And we will take the matter under advisement and issue an order or an opinion forthwith. This court is now in recess. Thank you. Thank you. Thank you.